IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JANET PUFFENBARGER, <br> Plaintiff, <br> <br> v. <br> <br> ENGILITY CORPORATION, *et al.*, <br> Defendants. | ) <br> ) <br> ) Case No. 1:15-cv-188 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

In this Sarbanes-Oxley ("SOX") and Dodd-Frank retaliation suit,[1] plaintiff alleges that her former employer retaliated against her after she reported to her supervisor that the employer had made an unauthorized paid time off cash payment to another employee. Following full discovery, the parties filed cross-motions for summary judgment.

As the motions have been fully briefed and argued, they are now ripe for disposition.

### I.

The undisputed material facts are as follows:[2]

- Plaintiff Janet Puffenbarger is a resident of Virginia.

- Defendant Engility Corporation ("Engility") is a Delaware corporation engaged in the business of providing various services to federal government agencies.

---

[1] *See* Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201, *et seq.*; Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78aaa, *et seq.*

[2] The undisputed material facts are derived from the parties' lists of undisputed facts and the summary judgment record as a whole, including the Joint Stipulation of Undisputed Facts, the depositions, declarations, and other documents. To the extent that either party has raised an objection to an asserted undisputed fact, that objection is noted herein, and the dispute is shown in the analysis that follows to be immaterial. The analysis that follows also demonstrates that certain assertions of fact by plaintiff are unsupported by the record.

1

- Defendant Richard Harkey is Engility's Vice President, Corporate Controller, and Chief Accounting Officer.

- Defendant John Buttari is Engility's Assistant Controller.

- Engility was formed in July 2012 when several divisions spun off from L-3 Communications Holdings, Inc. ("L-3") to form Engility.

- On November 5, 2012, Engility hired plaintiff as the Director of Payroll. Plaintiff worked in this capacity from January 5, 2013, until October 30, 2013.

- Engility is composed of several former divisions of L-3 ("L-3 Legacy Divisions"), including Global Security & Engineering Solutions ("GS&ES") and Command & Control Systems and Software ("CCSS").

- Each of the L-3 Legacy Divisions that formed Engility in the spinoff used different time-keeping, accounting, and payroll systems. For example, the CCSS business unit utilized a software program called UNANET for employee time-keeping, whereas the GS&ES business unit utilized a software program called Deltek Time & Expense.

- In January 2013, Engility adopted a uniform set of payroll systems for all of the L-3 Legacy Divisions as follows: (i) UNANET as the time-keeping system, (ii) Costpoint as the billing system, and (iii) Ceridan as the system for generating wage and vendor payments as well as employee documents, such as federal and state tax forms.

- In order for Engility's employees to charge accurate work hours to the correct cost centers and programs in the UNANET system, Engility had to be able to use Costpoint to generate accurate invoices for Engility's government customers and use Ceridan to generate accurate wage payments.

- Before plaintiff became Engility's Director of Payroll, she was employed by GS&ES as a Payroll Manager. GS&ES did not use UNANET as its time-keeping system, and plaintiff had no prior experience with UNANET.

- In July 2012, Engility hired Karri Brown as a Payroll Supervisor, and after plaintiff was hired, Brown worked in Engility's Payroll Department under plaintiff's supervision. Brown, formerly with CCSS, had used UNANET and Costpoint prior to Engility's formation.

- In February and March 2013, a problem arose in Engility's payroll and billing systems. Specifically, employees were being assigned to the wrong cost centers for Engility's various clients within UNANET and, as a result, Engility's

2

employees inadvertently and incorrectly recorded their time within UNANET. As a consequence, Engility using Costpoint did not generate accurate invoices for its customers, causing substantial invoicing delays. Each day that an invoice was delayed represented $4.5 million in receivables that could not be invoiced.

- Because Brown was under plaintiff's supervision, Brown had to wait for plaintiff's direction before addressing the employee-assignment and coding problems, even though Brown, unlike plaintiff, was experienced with UNANET and Costpoint.

- In March 2013, Harkey and Buttari began discussing how to restructure Engility's Payroll Department in order to make it more efficient in solving the employee-assignment problem.

- On May 16, 2013, Buttari met with Engility's then-Director of Human Resource Operations, Beth Skoletsky, to discuss the restructuring plans.

- Skoletsky and Buttari discussed splitting plaintiff and Brown's duties based on their different levels of subject-matter expertise with respect to Engility's payroll systems: Brown would focus on UNANET and Costpoint, with which Brown had prior experience, and plaintiff would focus on Ceridan, with which plaintiff had prior experience.

- Shortly thereafter, Buttari and Harkey agreed to implement the plan.

- Before Engility was created, each of the L-3 Legacy Divisions followed its own policies and practices with respect to accrued paid time off ("PTO"). In some L-3 Legacy Divisions, an employee could request to receive the cash value of the accrued PTO in lieu of taking vacation days. For example, in Buttari's L-3 Legacy Division, CCSS, Buttari had the authority to approve PTO cash outs and regularly did so.

- Effective January 1, 2013, Engility implemented and publicized a new policy that disallowed PTO cash outs, but it remained the Human Resources Department's ("HR Department") unwritten and unpublicized practice to allow certain PTO cash out exceptions in circumstances of hardship. Specifically, upon an employee's request, Tom Murray, Engility's Vice President of HR, would approve some employee hardship PTO cash outs and then send those approvals to plaintiff for payroll processing.

- Engility's total revenues in 2013 were $1.4 billion, its net income was $54.7 million, and its total assets were $930 million. Engility's PTO hardship cash outs in 2013 totaled approximately $169,000.

3

- In 2013, Engility's definition of materiality for purposes of an internal control over financial reporting under SEC regulations was an unauthorized transaction of $7.6 million or more.

- On June 20, 2013, Rebecca Duckrey, a Payroll Specialist for Engility, emailed Brown and Buttari with a request to cash out 30-50 hours of her accrued PTO balance. Buttari approved the request, and Brown processed the request. Marci Diciano in Engility's Payroll Department signed the applicable paperwork. Duckrey received a cash out for 50 hours of her accrued PTO, which totaled $856.20.

- Plaintiff became aware of the Duckrey PTO cash out while processing the payroll. On or about July 10, 2013, Harkey and plaintiff had a conversation in which plaintiff raised concerns that the Duckrey PTO cash out approved by Buttari was improper.[3]

- On July 18, 2013, during a Payroll Department meeting, Engility announced that it would restructure its Payroll Department such that plaintiff would be in charge of Information Systems, including Ceridan, and Brown would be in charge of Payroll Processing Activity, including UNANET and Costpoint. Plaintiff's title as Director of Payroll, as well as her pay and benefits, remained the same.[4]

---

[3] There is a dispute as to what exactly was said during the conversation. In plaintiff's personal notes, which she created soon after her July 10, 2013 conversation with Harkey, plaintiff wrote that: (i) "I ask[ed] him if he was aware of a PTO cash out within Payroll that had been approved and paid out" and (ii) "[Harkey] and I talked and I voiced my concern of how it was approved, not being processed through the payroll procedures and how bad this is for auditing and payroll." Pl.'s Personal Notes. And plaintiff specifically testified in her deposition that she was concerned that this means of authorizing a PTO cash out could create a problem in a future audit of the company's financial reports and books. Pl. Dep. 294-96. According to Harkey's deposition testimony, however, plaintiff never characterized the PTO cash out as a possible financial irregularity, fraud, or misappropriation of assets. Harkey Dep. 131, 159-64. In any event, as the analysis herein reflects, this dispute is not material to the grounds for the decision reached here.

[4] There is some dispute as to whether plaintiff's position changed in a meaningful way. Defendants offer evidence that plaintiff's role changed minimally. In addition, the record reflects that at the Payroll Department meeting Buttari asked plaintiff what resources, including personnel, she needed under the new structure. In this regard, Buttari granted plaintiff's request to continue supervising Sarah Williams. Buttari Dep. 215. Plaintiff, for her part, maintains that Engility reduced plaintiff's duties and reduced the number of employees she had previously supervised without her input. Pl. Ex. 4, Payroll Responsibilities Spreadsheet; Buttari Dep. 178; Brown Dep 60-61. In any event, as the analysis herein reflects, this dispute is not material to the grounds for the decision reached here.

- After the July 18, 2013 meeting, plaintiff complained to Christina Potter of Engility's Corporate Ethics Office that defendants had retaliated against plaintiff by means of the Payroll Department restructuring because plaintiff had voiced her concerns regarding the Duckrey PTO cash out. As a result of this complaint, Potter undertook an independent investigation and prepared a report. This report concluded that (i) no wrongdoing occurred; (ii) no internal controls were violated; and (iii) the decision to restructure the Payroll Department was made by Harkey and Buttari before plaintiff spoke with Harkey on July 10, 2013.

- Around the same time, plaintiff also reported the Duckrey PTO cash out to Janice Shuster, Engility's Director of Internal Audit. As a result of this report, Engility conducted its own internal audit, which found that the approval of the Duckrey PTO cash out did not violate an internal control. But the internal audit did find that, save for the Duckrey PTO cash out, all PTO cash outs in 2013 were approved by Murray. PTO Paid Cash Out Review (September 12, 2013).

- On October 22, 2013, plaintiff notified Engility in writing of her resignation, to be effective October 30, 2013.

- Plaintiff accepted a new position as the Director of Payroll at CARFAX, Inc. prior to her resignation from Engility.

## II.

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *See id.* at 325. Where evidence is lacking as to even one element of the plaintiff's case, there can be no genuine issue of material fact "since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 322. To defeat a motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (quoting Fed. R. Civ. P. 56(e)). In evaluating a

motion for summary judgment, a district court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). An issue of material fact is genuine when "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice." *Ross v. Communc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

SOX creates "whistleblower" protection for employees of publicly-traded companies by prohibiting employers from retaliating against employees who have "provide[d] information [to a supervisor] ... regarding any conduct which the employee believes constitutes" a violation of one of the fraud-related laws and regulations referenced in the statute. 18 U.S.C. § 1514A. Section 1514A references mail fraud, wire fraud, bank fraud, securities fraud, "any rule or regulation of the [SEC],"[5] and "any provision of Federal law relating to fraud against shareholders about potentially unlawful conduct." *Id.* The Fourth Circuit has made clear that "[t]he whistleblower protection provision of [SOX] adopts a burden-shifting framework." *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008). The plaintiff "must first establish a prima facie case by proving, by a preponderance of the evidence, that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable

---

[5] Although the statute states "any rule or regulation of the [SEC]," 18 U.S.C. § 1514A, the Fourth Circuit has made clear that this refers only to regulations that prohibit fraud and that "[t]o conclude otherwise would absurdly allow a retaliation suit for an employee's complaints about administrative missteps or inadvertent omissions from filing statements." *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 351 n.1 (4th Cir. 2008).

6

personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 344 (4th Cir. 2014) (internal quotation marks and citation omitted). If the plaintiff establishes a prima face case, then the defendant may prevail only if it "'rebut[s] the employee's prima face case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity.'" *Id.* at 345 (quoting *Welch*, 536 F.3d at 275). Put differently, a defendant can prevail by establishing, by clear and convincing evidence, that the putative protected activity was not a "but for" cause of the unfavorable personnel action.

Although defendants dispute each element of the prima face case, a careful review of the record reveals that the dispute focuses chiefly on whether plaintiff can establish the first element of her prima facie case—namely, that she engaged in a protected activity—and, if so, whether, following the burden-shift, defendants can establish by clear and convincing evidence that the protected activity was not a but for cause of defendants' decision to restructure the Payroll Department. Plaintiff loses on both fronts, each of which is addressed separately.

### A.

Analysis properly begins by considering whether plaintiff engaged in a protected activity under SOX when she reported the Duckrey PTO cash out to Harkey. She did not and hence she does not qualify as a whistleblower under SOX.

In order to establish that plaintiff engaged in a protected activity, plaintiff must show (i) that "[she] had both a subjective belief and an objectively reasonable belief that the conduct [she] complained of constituted a violation of [one of the laws listed in § 1514A]" and (ii) that [her] communications to [her] employer 'definitively and specifically relate[d]' to one of the laws

7

listed in § 1514A." *Welch*, 536 F.3d at 275.[6] Although "[a]n employee need not 'cite a code section [s]he believes was violated' in [her] communications to [her] employer," the employee's communications "must identify the specific conduct that [she] believes to be illegal" and must "at least approximate the basic element of fraud." *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 668 (4th Cir. 2015) (internal quotations and citation omitted).

Here, plaintiff did not engage in a SOX protected activity because, even assuming plaintiff satisfies the subjective belief requirement and further assuming that the specific content of her communications meets the *Welch* standard, no reasonable juror could conclude that a reasonable person in plaintiff's position would have believed that the Duckrey PTO cash out constituted a violation of any of the fraud-related laws and regulations referenced in § 1514A. Plaintiff contends, unpersuasively, that she reasonably believed that the Duckrey PTO cash out constituted bank fraud and wire fraud, as well as a violation of the SOX requirement that publicly traded companies must "devise and maintain a system of internal accounting controls." 15 U.S.C. § 78m(b)(2)(B)(iii). Each of these arguments is addressed in turn.

With respect to bank fraud and wire fraud, it was not objectively reasonable, based on the summary judgment record, for plaintiff to believe that the Duckrey PTO cash out constituted

---

[6] The Fourth Circuit, consistent with other circuits, based its decision to require "definitive[] and specific[]" communications upon deference to the Department of Labor ("DOL"), specifically the DOL's ruling in *Platone v. FLYi, Inc.*, ARB Case No. 04-154, 25 IER Cases 278 (DOL Admin. Rev. Bd. Sept. 29, 2006). After the Fourth Circuit adopted the *Platone* standard, the DOL changed course, and abrogated *Platone*'s requirement that an employee's communication must definitively and specifically relate to one of the enumerated categories. *See In the matter of Kathy J. Sylvester, et al. v. Parexel Int'l LLC*, ARB Case No. 07-123, 2011 WL 2165854, at *12 (DOL Admin. Rev. Bd. May 25, 2011). Although the Fourth Circuit has not yet decided whether to adopt the DOL's new standard, other circuits have done so on the ground that deference should be given to the DOL. *See Rhinehimer v. U.S. Bancorp Invests., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015); *Lockheed Martin Corp. v. Administrative Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1131-32 (10th Cir. 2013); *Wiest v. Lynch*, 710 F.3d 121, 131 (3d Cir. 2013); *Nielson v. AECOm Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014).

8

fraudulent activity. This is so because it was not reasonable to believe that the cash out amounted to a false statement. Importantly, there is no law prohibiting PTO cash outs; at most, the Duckrey PTO cash out violated only Engility's internal policy. Moreover, it is important to note that Engility did not follow this policy uniformly, as the HR department had an informal practice of granting hardship exceptions. Murray Dep. 92, 103-06. Indeed, plaintiff participated in the HR Department's informal practice and never once contended—nor does she do so now—that the PTO cash outs made pursuant to this informal practice constituted fraud. *Id.* at 101. Importantly, the only difference between the Duckrey PTO cash out and the other hardship exceptions is that the Duckrey PTO cash out was processed by Buttari and Brown, rather than by Murray and plaintiff. Duckrey Email; Brown Dep. 118-20; Buttari Dep. 209. In this regard, plaintiff asserts that the PTO cash outs that were processed by Murray and plaintiff were authorized, but that the Duckrey PTO cash out was unauthorized because it was processed via different means. Yet, plaintiff cites no record evidence to support this distinction, nor can she do so, as the HR department's informal practice of granting PTO cash outs was not memorialized as an official policy. Murray Dep. 92. Thus, no reasonable juror could find that plaintiff had an objectively reasonable belief that the Duckrey PTO cash out constituted a violation of any fraud-related law or regulation referenced in § 1514A. Simply put, plaintiff had no reasonable basis to believe that, unlike the PTO cash outs that she processed, the Duckrey PTO cash out was unauthorized simply because it was processed by different individuals through equally informal means.

Plaintiff next contends, unpersuasively, that she had an objectively reasonable belief that the Duckrey PTO cash out constituted a violation of the SOX requirement that publicly traded companies must "devise and maintain a system of internal accounting controls" insofar as Buttari and Brown contravened internal controls by authorizing the Duckrey PTO cash out. 15 U.S.C. §

78m(b)(2)(B). Specifically, plaintiff argues that she had an objectively reasonable belief that the Duckrey PTO cash out constituted a violation of an internal control because it was evidence that Engility's policy and procedures did not "provide reasonable assurance that ... receipts and expenditures of the issuer [were] being made only in accordance with authorizations of management and directors of the issuer." 17 C.F.R. § 240.13a-15(f). Yet, as defendants correctly point out, a publicly traded company's internal controls policy need only, under the SEC regulation, "[p]rovide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a *material* effect on the financial statements." *Id.* (emphasis added). As defendants correctly note, it was not reasonable for plaintiff to believe that the Duckrey PTO cash out—or even all of the other 2013 PTO cash outs combined—had a material effect on Engility's financial statements. In this respect, Engility's materiality threshold in 2013 for purposes of an internal control over financial reporting was an unauthorized transaction of at least $7.6 million. *See* SOX Materiality Worksheet FY2013 – Final. The Duckrey PTO cash out was $856.20, and in the aggregate, the total amount of PTO hardship cash outs in 2013 was $169,000. Because both amounts are well below the materiality threshold, no reasonable juror could conclude that it was reasonable for plaintiff to believe that the Duckrey PTO cash out was material, and hence it was not reasonable for plaintiff to believe the Duckrey PTO cash out constituted a violation of the SOX internal control requirement.

Plaintiff contends that she need not show materiality because materiality is not an independent requirement of a SOX retaliation claim. In support of this argument, plaintiff cites *Welch*, in which the Fourth Circuit made clear that "nothing in § 1514A ... indicates that § 1514A contains an *independent* materiality requirement." 536 F.3d 269 (emphasis added). But

plaintiff misreads *Welch*. The statement on which plaintiff relies was made in rejecting an argument that SOX protects only "communications relating to *material* violations of a listed law;" the Fourth Circuit in *Welch* did not hold that materiality is not relevant to the reasonableness of a plaintiff's belief that a defendant violated the law where, as here, materiality is an element of the law believed to have been violated. *Id.* (emphasis in original). Thus, contrary to plaintiff's contention, in determining whether a plaintiff had an "objectively reasonable belief that the conduct he complained of constituted a violation of [a law listed in § 1514A]," all of the elements of the alleged violation of law—including materiality—must be considered. *Id.* at 275.

In sum, plaintiff has adduced no competent record evidence to raise a genuine issue of material fact that plaintiff engaged in a protected activity. In other words, no reasonable juror could find that plaintiff had "an objectively reasonable belief that the conduct [s]he complained of constituted a violation of [a law listed in § 1514A]." *Welch*, 536 F.3d at 275.[7]

**B.**

Even assuming, *arguendo*, that plaintiff is able to establish a prima facie case of a SOX retaliation claim, defendants are nonetheless entitled to summary judgment because the undisputed record evidence confirms that defendants have rebutted plaintiff's prima facie case "by demonstrating by clear and convincing evidence that [Engility] would have taken the same personnel action in the absence of the protected activity." *Welch*, 536 F.3d at 275. Put

---

[7] It is worth noting that there are genuine factual disputes with respect to the other elements of a prima facie case for a SOX retaliation claim. But in view of the fact that plaintiff did not engage in a protected activity, it is unnecessary to address the other elements of the prima facie case.

differently, no rational juror could conclude that plaintiff's reporting of the Duckrey PTO cash out was a but for cause of the putative unfavorable personnel action. *See id.*[8]

It is undisputed that Engility made the decision no later than May 2013 to restructure the Payroll Department in order to make the Payroll Department processes more accurate and efficient. Buttari Dep. 257-58; Harkey Dep. 81-83, 175-76; Brown Dep. 126, 130-32; Pl. Dep. 128-41. By plaintiff's own admission, she had no experience with UNANET, whereas Brown had significant experience using UNANET. Pl. Dep. 21-24; 120-21; 145. In or around March 2013, Harkey and Buttari discussed restructuring the Payroll Department for the purpose of making the Payroll Department more accurate and efficient, and in May 2013, after consulting with Skoletsky, they decided to go forward with the restructuring. Harkey Dep. 111-13; Buttari Dep. 170-73; Skoletsky Dep. 65-66; Buttari Decl. ¶¶ 8-10.

Although it is undisputed that the plan to restructure the Payroll Department was established at least two months before plaintiff reported the Duckrey PTO cash out, plaintiff contends that the specifics of the plan, as discussed in May 2013, did not accord with the way Engility implemented the restructuring on July 18, 2013. This argument fails because plaintiff has adduced no competent record evidence to create a genuine issue of material fact as to whether the specifics of the actual implementation were different from the implementation planned by Engility. To the contrary, the undisputed factual record reflects that the discussions

---

[8] Although the causation requirement for plaintiff's prima facie case need only show that the protected activity was a *contributing* factor to the unfavorable personnel action, once the burden shifts to defendant to rebut plaintiff's prima facie case, there is a *but for* standard of causation, as defendants may prevail by "demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity." *Welch*, 536 F.3d at 275. It is assumed for purposes of summary judgment that the protected activity was a *contributing* factor to the putative unfavorable personnel action; analysis here focuses sharply on but for causation.

concerning the restructuring among Buttari, Harkey, and Skoletsky, were consistent with Engility's implementation of the restructuring insofar as both the discussions concerning the restructuring and the implementation of the restructuring focused on plaintiff and Brown's different, though complimentary, areas of expertise; plaintiff was given control over Information Systems, which included Ceridan, and Brown was given control over Payroll Processing Activity, which included UNANET and Costpoint. Moreover, rather than offering evidence to create a genuine issue of material fact, plaintiff simply asserts her belief that there was a meaningful difference between the discussions concerning the restructuring and the implementation of the restructuring; this is not sufficient to avoid summary judgment. *See Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("Mere assertions by the plaintiffs are not enough to survive summary judgment.").

Plaintiff further contends that even if the restructuring was planned prior to July 2013, the protected activity was still a but for cause of the restructuring's *timing*. Specifically, plaintiff argues that defendants have produced no evidence that they planned to implement the restructuring in mid-July, and therefore that defendants are unable to establish by clear and convincing evidence that plaintiff's protected activity was not a but for cause of the restructuring's implementation date. This argument fails for several reasons. To begin with, plaintiff has not established a triable issue of fact that the restructuring's timing, rather than the restructuring itself, was an unfavorable personal action.[9] Moreover, plaintiff has also failed to

---

[9] Although plaintiff could argue, when attempting to establish her prima facie case, that the restructuring's *timing* was the unfavorable personal action, she has not done so; rather, she contends that the restructuring itself was the unfavorable personal action and that the restricting's timing speaks only to causation. Moreover, even if plaintiff had argued that the restructuring's timing was the unfavorable personal action when establishing her prima facie case, this argument would have failed because plaintiff has adduced no competent record evidence to support it.

13

establish that there is a genuine issue of material fact that plaintiff's reporting of the Duckrey PTO cash out was a but for cause of the timing. Although the close temporal proximity (eight days) between plaintiff's reporting of the Duckrey PTO cash out and the restructuring may be sufficient to establish a genuine issue of material fact with respect to causation in plaintiff's prima facie case, it is not sufficient to raise a genuine issue of material fact as to whether plaintiff's reporting of the Duckrey PTO cash out was a but for cause of the Payroll Department restructuring. Indeed, the cases cited by plaintiff that relate to temporal proximity stand only for the proposition that temporal proximity is sufficient to support an inference in support of the causation requirement with respect to plaintiff's prima facie case; plaintiff cites no case for the proposition that temporal proximity, by itself, can support an inference of but for causation.[10]

In sum, defendants are entitled to summary judgment on plaintiff's SOX retaliation claim both because plaintiff cannot establish that she had an objectively reasonable belief that she engaged in a protected activity under SOX, and further because defendants have established by clear and convincing evidence that plaintiff's reporting of the Duckrey PTO cash out was not a

---

Thus, there is no genuine issue of material fact as to whether the restructuring's timing was an unfavorable personal action. As a result, defendants need only rebut the plaintiff's prima facie case on the assumption that the restructuring itself was the unfavorable personal action; defendants need not rebut hypothetical unfavorable personal actions that plaintiff has not proposed and could not have successfully established as an element of a prima facie case for a SOX retaliation claim.

[10] *See, e.g., Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) (holding that the causation element of the prima facie case "can be inferred from timing alone where an adverse employment action follows on the heels of protected activity") (internal quotation marks and citation omitted); *Feldman v. Law Enforcement Assocs. Corp.*, 955 F. Supp.2d 528, 553 (E.D. N.C. 2013) (holding that "[t]emporal proximity between the protected activity and the adverse action is a significant factor in considering circumstantial showing of causation" for the prima facie case) (internal quotation marks and citation omitted).

but for cause of the Payroll Department restructuring and plaintiff has presented no triable issue of fact contrary to that conclusion.

## IV.

Plaintiff's Dodd-Frank claim fares no better. This claim fails because plaintiff does not qualify as a whistleblower under Dodd-Frank, as plaintiff has not reported any information to the SEC, as is required by 15 U.S.C. § 78u-6.

Dodd-Frank "encourages individuals to provide information relating to a violation of U.S. securities laws to the [SEC]" by protecting whistleblowers from retaliatory actions by employers. *See Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622-23 (5th Cir. 2013). In this regard, Dodd-Frank expressly defines "whistleblower" as "any individual who provides ... information relating to a violation of the securities laws *to the Commission* [i.e., the SEC]." 15 U.S.C. § 78u-6(a)(6) (emphasis added). Dodd-Frank protects individuals who meet this definition from adverse employer actions on account of a "lawful activity" done by the whistleblower:

> (i) in providing information to the Commission in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii) in making disclosures that are required or protected under [SOX], this chapter ... , and any other law, rule or regulation subject to the jurisdiction of the Commission.

*Id.* § 78u-6(h)(1)(A). The SEC has adopted a definition of "whistleblower" for purposes of a Dodd-Frank retaliation claim that is contrary to the plain language of § 78u-6(a)(6) insofar as the SEC's definition does not require a whistleblower to provide the information regarding violations of securities laws *to the Commission*. Specifically, the SEC has defined

15

"whistleblower" for purposes of retaliation protection as a person who "provide[s]" the specified information "in a manner described in" the retaliation protection provisions of Dodd-Frank, which include the cross-reference to the reporting provisions of SOX that protect employees who report internally without reporting to the SEC. 17 C.F.R. § 240.21F-(2)(b)(ii).

Here, it is undisputed that plaintiff did not report anything to the SEC, as is required to qualify as a whistleblower under the definition set forth in § 78u-6(a)(6). Instead, she relies on the fact that she reported the Duckrey PTO cash out to Harkey. Thus, the question is whether this is sufficient to qualify as a "whistleblower" under § 78u-6. Although the Fourth Circuit has not yet addressed the issue, two other circuits have done so, each reaching a different conclusion. The Fifth Circuit has held that the meaning of "whistleblower" is clear under the statute—and therefore the SEC regulation is not entitled to *Chevron* deference—because "the plain language of § 78u-6 limits protection under the Dodd-Frank whistleblower-protection provision to those individuals who provide 'information relating to a violation of the securities laws' to the SEC." See *Asadi*, 720 F.3d at 630.[11] The Second Circuit, by contrast, has held that the meaning of "whistleblower" is sufficiently ambiguous to warrant *Chevron* deference on account of "the tension between the definition in [§ 78u-6(a)(6)] and the limited protection provided by subdivision (iii) of [§ 78u-6(h)(1)(A)]." *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 155 (2d Cir. 2015).[12] In particular, the Second Circuit concluded that the two subsections are in tension

---

[11] Several district courts have adopted the Fifth Circuit's interpretation of § 78u-6. *See, e.g., Englehart v. Career Educ. Corp.*, No. 8:14-cv-444-T-33EAJ, 2014 WL 2619501, at *9 (M.D. Fla. May 12, 2014); *Banko v. Apple Inc.*, 20 F. Supp.3d 748, 756 (N.D. Cal. 2013); *Wagner v. Bank of Am. Corp.*, No. 12-cv-00381, 2013 WL 3786643, at *6 (D. Colo. July 19, 2013).

[12] Prior to the Second Circuit's decision in *Berman*, several district courts had already concluded that the statute was sufficiently ambiguous to warrant deference to the SEC's regulation. *See, e.g., Khazin v. TD Ameritrade Holding Corp.*, No. 13-4149 (SDW)(MCA), 2014 WL 940703, at

insofar as § 78u-6(h)(1)(A) refers to actions that do not require an employee to report information to the SEC, such as making internal reports under SOX, whereas § 78u-6(a)(6) limits the term "whistleblower" to "individual[s] who provide[] ... information relating to a violation of the securities laws to the [SEC]." 15 U.S.C. § 78u-6(a)(6); *see Berman*, 801 F.3d at 150-55.

As the *Asadi* decision persuasively concluded, the statutory definition of "whistleblower" for purposes of a Dodd-Frank retaliation claim is plain and unambiguous insofar as it is limited to individuals who provide the specified information *to the SEC*. As the unanimous Fifth Circuit panel concluded, "[u]nder Dodd-Frank's plain language and structure, there is only one category of whistleblowers," namely "individuals who provide information relating to a securities law violation to the SEC." *Asadi*, 720 F.3d at 625. In this regard, "[t]he three categories listed in subparagraph § 78u-6(h)(1)(A) represent the protected activity in a whistleblower-protection claim;" they "do not ... define which individuals qualify as whistleblowers." *Id*. Indeed, contrary to the Second Circuit's conclusion, § 78u-6(a)(6) is not "in tension" with subdivision (iii) of § 78u-6(h)(1)(A). *Berman*, 801 F.3d at 155. Although it is true that an individual can take actions referenced in subdivision (iii) of § 78u-6(h)(1)(A)—namely, making disclosures that are protected under SOX—yet still not qualify as a whistleblower under Dodd-Frank, "that practical result does not render § 78u-6(h)(1)(A)(iii) conflicting or superfluous." *Asadi*, 720 F.3d at 626. Rather, it simply limits protection for the actions listed in subdivision (iii) of § 78u-6(h)(1)(A) to individuals who, in addition to meeting the requirements set forth in SOX or any other relevant law, report violations *to the SEC. See id*. To reach the contrary conclusion would be to excise unambiguous language from the statute. Indeed, as Judge Jacobs made clear in his dissenting

---

*3-6 (D. N.J. Mar. 11, 2014); *Azim v. Tortoise Capital Advisors, LLC*, No. 13-2267-KHV, 2014 WL 707235, at *2-3 (D. Kan. Feb. 24, 2014); *Ellington v. Giacoumakis*, 977 F. Supp.2d 42, 44-46 (D. Mass. 2013).

opinion in *Berman*, the *Berman* majority flouted its judicial "obligation ... to apply congressional statutes as written" when it "altered a federal statute by deleting three words ('to the Commission') from the definition of 'whistleblower' in the Dodd-Frank Act." *Berman*, 801 F.3d at 155 (Jacobs, J. dissenting). Thus, because "the intent of Congress is clear," as the statute directly and unambiguously limits whistleblower protection to individuals who report to the SEC, it is necessary to "give effect to the unambiguously expressed intent of Congress," and hence to reject the SEC's more expansive interpretation of the term "whistleblower." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Importantly, it must be noted that even if the SEC's more expansive interpretation of "whistleblower" applied, it would make no difference here. This is so because although plaintiff is not required to report a violation to the SEC under the SEC's interpretation,[13] she is still required to show that her activity was "protected under [SOX]," and as already discussed, plaintiff can make no such showing in the present case. 15 U.S.C. § 78u-6(h)(1)(A).

---

[13] *See* 17 C.F.R. § 240.21F-(2)(b)(ii).

V.[14]

For the reasons stated here, defendants' motion for summary judgment must be granted, and plaintiff's motion for summary judgment must be denied.

An appropriate Order will issue.

Alexandria, VA
December 31, 2015

/s/
T. S. Ellis, III
United States District Judge

---

[14] Although plaintiff's complaint appears to allege a constructive discharge claim, plaintiff's brief in opposition states that "[plaintiff] has not included a Count in her Complaint for Constructive Discharge or Wrongful Termination." Pl. Opp. Br. at 10. Accordingly, defendants are entitled to summary judgment on this claim.